UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CSA-CREDIT SOLUTIONS
OF AMERICA, INC.,

       Petitioner,

                                File No. 1:05-CV-565

v.

                                HON. ROBERT HOLMES BELL

JULIE SCHAFER,

       Respondent.

_____/

# O P I N I O N

    This is an action filed by CSA-Credit Solutions of America, Inc. ("CSA") to compel Respondent Julie Schafer to arbitrate her claims.  Presently pending before the Court are both Respondent's motion to quash the petition (Docket #5) and Petitioner's motion to compel arbitration (Docket #9).  The matter has been fully briefed and the Court heard oral argument on December 12, 2005.  Upon due consideration, Respondent's motion to quash is DENIED and Petitioner's motion to compel arbitration is GRANTED.

## I.

    CSA is a for-profit Texas corporation that offers "debt settlement" assistance.  On September 28, 2004, Respondent Julie Schafer signed an agreement with CSA under which CSA promised to renegotiate her high credit debt (in particular, her debts to Citibank and DiscoverCard) to approximately 40% of its original total.   In July and September, prior to

entering into her agreement, Schafer repeatedly was advised by CSA's credit specialist Adam Clark that CSA had no Better Business Bureau complaints filed against it, when, in fact, numerous complaints had been filed since May 30, 2003.  Before signing, Schafer communicated with Clark about her worries that the company did not plan to contact her creditors until October 20, 2004.  Schafer advised CSA that, while her payments were then-current, certain of her bills would be overdue by October 20, 2004.  Clark responded that the best thing for Schafer to do would be to avoid contact with creditors because CSA would be making contact and having calls redirected to them within 72 hours of the effective date of her agreement.  After signing, Schafer repeatedly was reminded by CSA not to contact her creditors and to ignore their attempts to contact her.

On April 15, 2005, Schafer received a certified letter from an attorney for Citibank, informing her that she was being sued.  She immediately contacted CSA.  A CSA representative advised her by e-mail that the process for suit was a long one and that she should immediately fax any documents to CSA, whose Litigation Support Team would recommend a next course of action.  CSA advised, however, that she should not hire an attorney, as a court could view her ability to pay an attorney as undermining her claim of financial hardship.  On April 18, 2005, Schafer faxed a copy of the summons and complaint to CSA, and CSA advised her by e-mail that the Litigation Team was reviewing her information.  CSA also forwarded information to Schafer explaining how to file a pro per answer to the complaint.  Schafer followed that advice and filed a pro per answer.  Based on

the inadequate answer, Citibank filed an immediate motion for summary disposition.  Again

Schafer forwarded the motion.  Despite numerous contacts with CSA, Schafer never received

the promised assistance from CSA, and Citibank obtained a judgment against her for more

than $17,957.11.  In the meantime, DiscoverCard referred Schafer's debt to a collection

company.

The agreement Schafer signed with CSA includes the following arbitration clause:

> 10. <u>Arbitration of Dispute</u>. - If there is any dispute between the parties arising
> out of this agreement, the parties agree to submit that dispute to binding
> arbitration under the auspices of the of the [sic] American Arbitration
> Association (AAA). If such arbitration is held under the auspices of any other
> organization, the arbitration will be held in accord with AAA rules to the
> extent possible.  Binding arbitration means that both parties give up the right
> to a trial by jury and to appeal except for a narrow range of issues that may be
> appealed under Texas law.  Discovery may be limited by the arbitrator.

(Agreement ¶ 10; Docket #7-2 at 6.)[1]  (Agreement ¶ 11; Docket #7-2 at 6.)

On August 9, 2005, an attorney representing Schafer sent a letter to CSA, stating that

Schafer intended to file suit against CSA, alleging claims worth in excess of $100,000.  (Pet.

Ex. C.: Docket #1.)  Schafer's attorney enclosed a copy of a draft complaint against CSA

raising six claims: (1) violation of the Michigan Debt Management Act; (2) violation of the

---

[1] The agreement also includes a choice-of-law provision declaring that Texas law will govern any dispute. Respondent suggests that Michigan law should apply notwithstanding the choice-of-law provision.  Petitioner, in contrast, suggests that the relevant law applicable to the dispute is the Federal Arbitration Act and the body of case law implementing that act. The parties agree, however, that the Court need not determine which law governs, since federal, Texas and Michigan law are not materially different with respect to the principles of contract formation and arbitrability.  (Resp. Mem. at 10: Docket #7; Pet. Mem. at 5: Docket #10.)

Michigan Consumer Protection Act; (3) conversion; (4) fraudulent misrepresentation; (5) unauthorized practice of law; and (6) breach of contract.  (Pet. Ex. B: Docket #1.)  On August 23, 2005, CSA filed the instant action to enforce the arbitration clause, contending that Respondent's claims "arise out of" the agreement and therefore fall within the scope of the arbitration provision.  Schafer subsequently filed a motion to quash the petition (Docket #5), raising a number of grounds, including that the agreement was invalidly formed and violates Michigan public policy.  CSA, in turn, moved to compel arbitration (Docket #9). The matter is before the Court on both motions.

## II.

The Federal Arbitration Act ("FAA") provides that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  If a plaintiff's claim is governed by an arbitration clause, a court must compel arbitration.  9 U.S.C. § 3.  Under the FAA, a district court must make a number of threshhold determinations before compelling arbitration: (1) whether the parties agreed to arbitrate; (2) the scope of the arbitration agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if the court finds some but not all claims to be subject to arbitration, whether to stay the remainder of the proceedings pending arbitration.  *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)); 9 U.S.C. § 4.

The courts repeatedly have recognized that the FAA manifests "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "'[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004). Federal law creates "a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576-77 (6th Cir. 2003) (quoting *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986)). The party opposing an arbitration agreement bears the burden of defeating it. *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 91 (2000) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)).

## III.

In her motion to quash, Schafer makes a series of arguments as to why the arbitration clause is not enforceable against her. First, she contends that, for a variety of reasons, a valid and binding contract was not made and the arbitration agreement therefore constitutes no bar to a state-court action by Schafer. Second, she argues that the arbitration clause is ambiguous and therefore unenforceable. Third, she asserts that, even if a valid agreement exists and the arbitration clause is enforceable, her claims against CSA include several that occurred

5

outside of the contract period and outside the scope of the agreement and therefore are not barred by the arbitration clause. Fourth, she argues that she cannot be compelled to arbitrate her claims because certain remedies are not available in arbitration. Fifth, Schafer argues that the contract with CSA violated Michigan public policy and she therefore is not bound by her agreement to arbitrate. Sixth, in her response to CSA's motion to compel arbitration, she argues that the agreement to arbitrate cannot be enforced in a consumer debt counseling case such as hers because the high costs of arbitration effectively preclude the vindication of her claims.

A.    No Valid and Binding Contract Was Formed

Schafer represents that, before she entered into her agreement with CSA, both Citibank and DiscoverCard had longstanding policies against negotiating with for-profit debt settlement companies such as CSA. She therefore argues that CSA knew at the time the contract was made that it could not provide the services it promised to Schafer. As a result, she contends that the contract with CSA was void, not merely voidable. Because no contract was legally formed, she argues, she is not bound by the arbitration clause.

Schafer's first claim has a number of subparts. First, she contends that ordinary provisions of contract recission warrant voiding the contract. Second, she asserts that the contract is void under the doctrine of frustration of purpose. Third, she argues that she was fraudulently induced into entering into an agreement with CSA. Fourth, she claims she was fraudulently induced into entering into the arbitration provision of the contract. Fifth, she

complains that the material terms and provisions of the services agreement with CSA were unconscionable.

All but the fourth of Schafer's arguments constitute challenges to the overall validity of the agreement for services rather than challenges to the arbitration provision itself.  As such, they are barred by the Supreme Court's holding in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967).  In *Prima Paint*, the Supreme Court held that, if a party alleges it has been defrauded by statements made prior to the execution of the contract, that issue may be arbitrated in accordance with the arbitration clause.  A party may not avoid arbitration by attacking the overall contract between the parties.  *Id.* at 403-04.  As the Sixth Circuit held in *Masco*, 382 F.3d at 627, *Prima Paint* rejected all attacks on an arbitration clause "based on a disagreement regarding an underlying contractual dispute . . . ," including claims of mutual mistake and fraudulent inducement.  *Masco*, 382 F.3d at 629.  Indeed, the Sixth Circuit interprets *Prima Paint* as holding that arbitration clauses are "separable" from the contracts in which they are included for purposes of determining whether a contract was formed.  *Glazer*, 394 F.3d at 452 (citing *Burden v. Check into Cash of Kentucky, LLC*, 267 F.3d 483, 488 (6th Cir. 2001)).

The Sixth Circuit has directly addressed the question whether a contract alleged to be void *ab initio* as opposed to merely voidable impacts the enforceability of an arbitration clause.  *See Burden*, 267 F.3d at 488-89.  In *Burden*, the court reasoned that a challenge to a contract as void *ab initio* arguably could fall outside the bar of *Prima Paint* and require

7

interpretation by a court, not an arbitrator.  However, the *Burden* court recognized that "courts have addressed questions of void *ab initio* contracts as questions of signatory power not contract content.  *See Burden*, 267 F.3d at 489-90 (citations omitted).  In the instant case, Schafer does not claim that she did not sign the contract or that she was in some way impaired when she did so.  Instead, she seeks to challenge the substance of the agreement, which she argues is "void" on the basis of a variety of statutory and common law violations. Shafer's claims do not concern her failure to assent or her signatory power.  They therefore are claims to be determined by the arbitrator and not the court.  *Burden*, 267 F.3d at 490-41 (citing *Prima Paint*, 388 U.S. at 404; *C.B.S. Employees Fed. Credit Union v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 912 F.2d 1563, 1568 (6th Cir. 1990)); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Kean Argovitz Resorts*, 383 F.3d 512, 516 (6th Cir. 2004); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 628 (6th Cir. 2003).  In sum, Schafer's challenges to the overall services agreement must be submitted to arbitration in accordance with *Prima Paint*.[2]

---

[2]The Court also notes that Schafer has failed to cite case law or otherwise support several of her challenges to the underlying contract.  For example, she has failed even to articulate the standard for determining unconscionability under either Texas or Michigan law, much less to prove its existence.  In Michigan, to prove unconscionability, Schafer must demonstrate that the provision in issue is both procedurally and substantively unconscionable.  *See Lozada v. Dale Baker Oldsmobile*, 91 F. Supp. 2d 1087, 1104 (W.D. Mich.) (citing *Morris v. Metriyakool*, 418 Mich. 423, 440, 344 N.W.2d 736, 742 (Mich. 1984); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (1998)).  The Court has not addressed the merits of Schafer's claims, however, because determination of their persuasiveness remains the prerogative of the arbitrator.

In her fourth argument under her first claim, Schafer argues that she was fraudulently induced into signing the arbitration provision itself by CSA's attempts to minimize the clause. As evidence for her position, she notes that the arbitration provision fails to capitalize the term "AGREEMENT," in accordance with the practice throughout the remainder of the agreement. Similarly, rather than referring to Schafer and CSA as "CLIENT" or "CSA," as used in the remainder of the agreement, the arbitration clause refers only to "the parties." Both differences, she argues, detract substantial attention from the provision.

In making her argument, Schafer fails to cite any authority. She also specifically fails to address Sixth Circuit precedent addressing a similar claim. In *Burden*, 267 F.3d at 491, plaintiffs argued that certain arbitration clause were fraudulently induced because they appeared on the reverse side of the loan agreements. *Id.* The *Burden* court rejected the claim, stating that a party signing a contract is presumed to know its contents. *Id.* at 492. In the instant case, in contrast with *Burden*, Schafer alleges only insignificant differences between the arbitration clause and the remainder of the agreement. Notwithstanding those minor differences, the arbitration clause was set forth on the same page and in the same manner as every other provision of the contract: in a numbered paragraph including a separate heading using bold type and underlining. In addition, the heading was captioned, "Arbitration of Dispute," clearly identifying its content. Applying *Burden*, the provision cannot be deemed to have been fraudulently induced. *See also Bitkowski v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 866 F.2d 821, 823 (6th Cir. 1987) (party alleging fraud in the

inducement must prove by clear and convincing evidence that she entered into the arbitration agreement, not the overall agreement, based on another party's intentional, false and material misrepresentation).

B.   Ambiguous Arbitration Clause

Schafer next argues that the second sentence of the arbitration provision contradicts the first sentence and therefore the provision is ambiguous and unenforceable. Specifically, she argues that the first sentence of the provision requires that arbitration be conducted through the auspices of the American Arbitration Association. The second sentence, however, states that "[i]f such arbitration is held under auspices of any other organization, the arbitration will be held in accord with AAA rules to the extent possible." Schafer argues that "the only reasonable conclusion [that] can be drawn from the reading of those two sentences is arbitration is optional."

Schafer's argument again is both unsupported by legal citation and factually unpersuasive. Contrary to her assertion, the sentences may be easily reconciled as expressing an intent to agree to resolution by the AAA but making provision for a circumstance in which access to the AAA is unavailable. Nothing about the language of the provision suggests ambiguity about the mandatory nature of arbitration. Further, even were the provision ambiguous, the law provides that "there is a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted

dispute." *Masco*, 382 F.3d at 627 (internal quotations omitted).  Accordingly, no basis exists

for finding the arbitration provision unenforceable on the grounds of ambiguity.

 C. Claims Occurring Prior to Agreement and Outside Scope of Agreement

 Respondent Schafer asserts that, even if the arbitration clause and contract are both

enforceable, certain of her claims are outside the scope of the contract and its arbitration

clause.  Specifically, she contends that her claims based on pre-contract fraud and her claims

under the Michigan Consumer Protection Act and the Credit Services Protection Act are

outside the compass of the agreement to arbitrate "any dispute between the parties arising out

of this agreement . . . ."  She also argues that her claim concerning the unauthorized practice

of law is not arbitrable because the agreement itself states that CSA "does not provide

investment, tax, or legal advice of any kind."

 Schafer's claims concerning pre-contract misrepresentation fall within the scope of

the arbitration clause, notwithstanding the fact that the alleged misrepresentation occurred

prior to the signing of the service agreement.  In *Prima Paint,* the Supreme Court addressed

a similar claim of fraudulent inducement to enter into a contract and a comparably broad

arbitration clause, which provided:

> Any controversy or claim arising out of or relating to this Agreement, or the
> breach thereof, shall be settled by arbitration in the City of New York, in
> accordance with the rules then obtaining of the American Arbitration
> Association.

388 U.S. at 398.  The Court held the arbitration clause sufficiently broad to encompass a

claim of fraudulent inducement in the making of the agreement based on conduct preceding

the signing of the contract.  *See Prima Paint*, 388 U.S. at 404 (a "claim of fraud in the

inducement of the entire contract" is a matter to be resolved by an arbitrator).  Similarly, in

*Masco*, the Sixth Circuit addressed an arbitration clause reading, "Any dispute arising out of

the interpretation, performance or alleged breach of this agreement, shall be submitted to

arbitration."  382 F.3d at 625.  The Sixth Circuit held that the question of whether a contract

was formed was itself arbitrable within the broad language of the clause.  *Masco*, 382 F.3d

at 628.

The "material misrepresentations" alleged by Schafer all are related to her claim that

the contract should not be enforceable or that she had an agreement outside the scope of the

contract, notwithstanding the contract's integration clause.  The damages she asserts therefore

"arise out of" the scope of her agreement with CSA.  As a consequence, the claims are

arbitrable.  *Prima Paint*, 388 U.S. at 402-04; *Masco*, 382 F.3d at 628; *Glazer v. Lehman

Bros., Inc.*, 394 F.3d 444, 447 (6th Cir. 2005).

Schafer's claim of unauthorized practice of law is somewhat different.  Schafer argues

that, by its terms, the service agreement with CSA excludes all legal representation:

> CLIENT expressly acknowledges that CSA does not provide investment, tax,
> or legal advice of any kind.  If CLIENT needs legal expertise or court filings,
> CLIENT should consult with an attorney.

(Agreement, ¶ 9; Pet. Ex. A.)  As a consequence, according to Schafer, any claim involving

the legal advice given by CSA necessarily does not "arise out of the agreement."

While the argument has some superficial appeal, it cannot withstand scrutiny. In order to decide the claim and whether it falls outside the agreement, the arbitrator or court would be required to determine whether CSA's advice amounted to "legal advice" within the meaning of the agreement. In other words, in order to resolve at least part of the claim, the agreement would have to be interpreted. Moreover, the alleged advice unquestionably arose out of the contractual relationship between the parties. In that sense as well, the dispute arises out of the agreement. As previously stated, any doubt about the arbitrability of a particular claim must be resolved in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Masco*, 382 F.3d at 627 (internal quotations omitted). In light of the well-established presumption favoring arbitration, the Court concludes that Schafer's unauthorized-practice-of-law claim is arbitrable.

D.     Remedies Not Available at Arbitration

Respondent Schafer next asserts that her claims under the Credit Services Protection Act and the Unauthorized Practice of Law statute contemplate remedies not available in arbitration: an injunction against CSA to prevent future violations of the statutes. Once again, Respondent cites no authority for her assertion and that assertion is at odds with the law.

The rules of the AAA themselves provide that an arbitrator has the authority to issue injunctive and other equitable relief. *See* AAA COMM. ARB. R. 34(a) ("The arbitrator may

take whatever interim measures he or she deems necessary, including injunctive relief . . . .");

AAA COMM. ARB. R. 42(a) ("The arbitrator may grant any remedy or relief that the arbitrator

deems just and equitable . . . ."). The courts have construed the rules as conferring the power

to grant injunctions. *See, e.g., Positive Software Solutions, Inc. v. New Century Mortgage*

*Corp.*, 90 Fed. Appx. 728, 729 (5th Cir. 2004); *Merrell Lynch, Pierce, Fenner & Smith, Inc.*

*v. Grall*, 836 F. Supp. 428, 430-31 (W.D. Mich. 1993). Accordingly, the nature of the relief

sought by Respondent presents no bar to arbitration.

     E.    <u>Violation of Public Policy</u>

     Respondent also argues that arbitration should not be compelled because the contract

with CSA was based on acts prohibited by Michigan law and therefore is void as violative

of public policy. Specifically, she contends that CSA's requirement of payment before

rendering services and failure to perform services within 90 days both violate the Michigan

Credit Services Act. The Court previously has addressed and rejected this contention in the

context of its discussion of void versus voidable contracts. *See Burden*, 267 F.3d at 489-90

(contracts are void as opposed to voidable when a party demonstrates that a contract is void

as opposed to voidable only when the challenger alleges the lack of signatory authority). For

the same reasons discussion in Section III.A. of this opinion, *infra*, Respondent's argument

to avoid arbitration is barred by the doctrine of *Prima Paint*, 388 U.S. at 403-04.

14

F.    <u>Prohibitively High Arbitration Costs</u>

In her reply brief, Schafer raises an entirely new claim.  She contends that the agreement to arbitrate cannot be enforced in a consumer debt counseling case such as hers because the cost of arbitration precludes the effective vindication of consumer rights.  In support of her claim, Schafer cites *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 90 (2000), in which the Supreme Court recognized that an agreement that did not make specific provisions for the costs of arbitration could be deemed unenforceable if those costs compel a party to forego enforcement of her rights.  In *Green Tree*, the Supreme Court rejected the contention that a cost-splitting provision *per se* will deter a substantial number of potential litigants from seeking any forum to vindicate their rights.  Instead, the Court adopted a case-by-case approach to determine whether litigants would be deterred from effectively vindicating their federal statutory rights.  317 F.3d at 659.  The *Green Tree* Court held that the burden of making such a showing fell on the party seeking to avoid arbitration. The party must show actual hardship, not mere risk that she would be required to bear prohibitive arbitration costs.  *Green Tree*, 531 U.S. at 91-92.  The Court left open, however, how detailed such a showing must be.  *Id.*

Thereafter, in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 669-70 (6th Cir. 2003) (*en banc*), the Sixth Circuit discussed at length the application of *Green Tree* to a case involving cost-splitting clauses contained in the arbitration provisions of two employment agreements.  The *Morrison* court distilled three central propositions of law from *Green Tree*:

First, in some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum. Under *Gilmer* [*v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)], the arbitral forum must provide litigants with an effective substitute for the judicial forum; if the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum. Second, where that prospect deters potential litigants, the arbitration agreement, or, at minimum, the cost-splitting provision contained within it, is unenforceable under *Gilmer*. Third, the burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison*, 317 F.3d at 659-60. The *Morrison* court held:

[P]otential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum. Our approach differs from the case-by-case approach advocated in *Bradford* by looking to the possible "chilling effect" of the cost-splitting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case.

*Id.* at 663. As a result, the *Morrison* court instructed that, "if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute." *Id.* Applying the standard, the *Morrison* court found the cost-splitting provision under consideration to be unenforceable. As a remedy, however, the court did not refuse to enforce the arbitration provision. Instead, the court severed both the cost-splitting clause and a clause limiting remedies from the arbitration provision. *Id.* at 675.

16

In reaching its determination about the kind of showing required by a plaintiff challenging an arbitration provision on the basis of cost, the *Morrison* court distinguished *Green Tree*, noting that *Green Tree* involved an arbitration provision that was silent on the allocation of arbitration costs, which, as the *Morrison* court noted, made "the risk of incurring such costs [] highly speculative, indeed." *Id.* at 660.  In contrast, in *Morrison*, the provision expressly mandated that the employee pay one-half of the cost of arbitration.  *Id.* at 655.  As a result, Morrison's risk of incurring substantial costs was far from speculative.

Upon review, the Court finds that Schafer has failed to demonstrate that arbitration will be prohibitively expensive under the standards set forth in *Green Tree* and *Morrison*. *See Green Tree*, 531 U.S. at 92; *Morrison*, 317 F.3d at 663.  First, in the instant case, as in *Green Tree*, the arbitration provision is silent on cost allocation.  As a result, in contrast to *Morrison*, the agreement, by its terms, does not automatically impose substantial costs upon Schafer.

Second, both Schafer and CSA have introduced evidence regarding the actual cost of arbitration for consumer claims such as the instant case.  According to AAA materials introduced by both parties, filing and case service fees for consumer cases claiming more than $10,000 and less than $75,000 is only $375.  (2003 AAA "Fair Play" Summary, at 34; Docket #14, Ex. A.)  All other fees are paid by the business.  *Id.*  In addition, the limitation on actual damages does not impair a party's right to pursue attorney fees and punitive damages in any amount in excess of the $75,000 without additional cost.

17

Only if a claim exceeds $75,000 in value does a consumer face any possibility of exposure to additional costs. The filing fee for claims between $75,000 and $150,000 is $2,550, and the fee for claims between $150,000 and $300,000 is $4,000. Admittedly, beyond those fees, the parties must pay the arbitrator's hourly fees, which Schafer extravagantly estimates at between $2,500 and $10,000. The AAA materials reveal, however, that many arbitrators have volunteered to serve *pro bono* in consumer cases. (2003 AAA "Fair Play" Summary, at 34; Docket #14, Ex. A.)

CSA argues that Schafer's claims do not reasonably exceed $75,000. It therefore contends that Schafer's total costs to arbitrate will be limited to $375. Further, CSA notes that AAA has another hardship initiative, providing a fee waiver policy for consumers with incomes less than 200% of the poverty line, which CSA argues Schafer meets. (2003 AAA "Fair Play" Summary, at 36; Docket #14, Ex. A.) In addition, the arbitrator retains the ability to shift all costs of arbitration to CSA. *Id.* CSA therefore asserts that Schafer has failed to demonstrate that she will not be able to pay arbitration costs.

The Court agrees. As previously stated, Schafer would potentially be responsible for only $375 on any claims between $10,000 and $75,000. That amount is not significantly different than the $250 filing fee imposed in the federal district court, which Schafer admits she is able to pay. Indeed, Schafer does not dispute her ability to pay $375. The Court is unpersuaded that Schafer's damages exceed $75,000. At oral argument, Schafer was unable to identify significant damages in excess of the amount paid to CSA ($1,271.31) and the

difference between the Citibank judgment against her ($17,957.11), and the amount she owed or anticipated CSA would renegotiate on her behalf.  She also anticipated that CSA would negotiate a 40% reduction in her approximately $10,000 in Discover Card debt, which has now been referred to collection.  Even assuming that she is entitled to expectation damages of 40% of the amount she originally owed, Schafer can only claim approximately $10,000 to $15,000 in such damages.

Schafer claims, however, that her credit rating has been ruined through her reliance on CSA's fraudulent representations, causing a substantial injury to her reputation.  But Schafer sought help from CSA precisely because she was very close to being unable to meet her financial obligations.  Moreover, she agreed in the contract with CSA that she was aware that merely retaining CSA and having it renegotiate her debt was likely to be used against her by a credit reporting agency.  (Agreement ¶ 9; Docket #1, Ex. A.)  As a result, her ability to prove more than $60,000 in reputation damages attributable solely to CSA's fraudulent or improper conduct is highly speculative.

At oral argument, Schafer contended that CSA effectively had conceded that her claims exceeded $75,000 in value by filing their petition for order to compel arbitration in federal court, in which they asserted diversity jurisdiction.  However, CSA's invocation of federal diversity jurisdiction is not dispositive of whether Schafer realistically can prove more than $75,000 in damages and whether the costs of arbitration will deter her from seeking relief.  The Court is unpersuaded that Schafer has demonstrated that her claim is

worth more than $75,000.  She therefore is unable to demonstrate that arbitration fees will deter her from vindicating her rights.

Moreover, even assuming that Schafer could prove more than $75,000 in damages, she has failed to demonstrate that she is at risk of paying a prohibitively high amount in fees and costs for arbitration.[3]  The "Fair Play" provisions provided by the AAA are available for needy claimants.  Although she acknowledges that her own financial circumstances fall within the AAA hardship provision, Schafer argues that she is ineligible for such relief because her husband's income of $37,000 per year would be considered by the AAA in determining whether she falls within 200% of the federal poverty guidelines for a family of seven.  Yet Schafer has not attempted to demonstrate that the AAA would consider her spouse's income in evaluating her eligibility.  Instead, she argues that, because it may, she would not be eligible for the requested relief.  Such a claim is wholly speculative.  Moreover, while Schafer recites her husband's income as a ground for believing she will be ineligible for hardship relief before the AAA, she at no time considers his income in evaluating her own ability to pay the costs of arbitration.  In fact, although Schafer's personal income is only

---

[3]The Court notes that, following oral argument, CSA filed a supplemental brief, in which it agreed to pay all AAA fees and costs above the federal civil action filing fee if Schafer submits a claim with AAA in which she seeks damages in excess of $75,000 and the AAA refuses to waive her fees and costs for that claim.  As Schafer notes, however, such a unilateral offer may not be used to alter the terms of the agreement, which imposes obligations under AAA rules.  *See Cooper v. MRM Investment Co.*, 367 F.3d 493, 512 (6th Cir. 2004) (offer to pay arbitration costs notwithstanding contract language incorporating AAA rules is irrelevant to determination of whether arbitration costs were prohibitive) (citing *Morrison*, 317 F.3d at 676-77).

approximately $30,000, the collective family income available to Schafer is $67,000 per year. Schafer has made no effort to demonstrate how the potential costs of arbitration for claims exceeding $75,000 would be prohibitively expensive to her based on an available income of $67,000. Schafer may not have it both ways. If her husband's income is available for one purpose, it must be considered available for the other. Schafer, therefore, has failed to meet her burden of proof.

Under *Morrison*, in determining the enforceability of an arbitration provision on the basis of cost, the Court also must consider whether persons similarly situated to Schafer would be deterred from vindicating their rights by the arbitration agreement. *See Morrison*, 317 F.3d at 663-64. As the Court previously has observed, using the value of Schafer's income as representative, most similarly situated persons would be able to pay the costs of arbitration, when considering the small cost of claims under $75,000 and the AAA's hardship waiver provisions. *See id.* at 663 ("[The court] should take the actual plaintiff's income and resources as representative of this larger class's ability to shoulder the costs of arbitration."). Moreover, "in addressing the effect of arbitration costs on a class, the reviewing court should look to average or typical arbitration costs, because that is the kind of information that potential litigants will take into account in deciding whether to bring their claims in the arbitral forum." *Id.* at 664. According to AAA statistics from 2001, the average consumer claim was $29,477 and the median claim was $24,182. *See* 2003 AAA "Fair Play" Exec. Summary at 2; Docket #14 Ex. A.) All such claims would be subject to the $375 cap on

21

costs.  Moreover, even if Schafer's own claims were viewed as typical, the value of those claims would fall within the confines of the $375 fee cap.  As a consequence, the likely costs of arbitration for consumers similarly situated to Schafer would not deter the effective vindication of rights.

Under all of the circumstances, the Court finds that Schafer has failed to meet her burden of proving that arbitration costs are prohibitive.[4]  Accordingly, excessive costs do not preclude enforcement of the arbitration clause.

## IV.

For the foregoing reasons, the arbitration provision of the Client Service Agreement signed by Julie Schafer on September 28, 2004 is enforceable.  As a consequence, Respondent's motion to quash the petition will be denied and Petitioner's motion to compel arbitration will be granted.  A judgment consistent with this opinion will issue.

Date:   January 6, 2006            /s/ Robert Holmes Bell
                                   ROBERT HOLMES BELL
                                   CHIEF UNITED STATES DISTRICT JUDGE

---

[4]The Court also acknowledges that, as CSA argues, AAA rules provide that arbitrators may shift costs.  (Resp. to Mot. to Compel, Ex. A at 13: AAA Rule 43; Docket #13.) Although this fact may add weight to the Court's conclusion that Schafer will be unlikely to bear significant economic burden, the Sixth Circuit has cautioned courts reviewing arbitration costs to discount the arbitrator's discretionary power to shift costs if the party prevails.  *See Morrison*, 317 F.3d at 664, *cited in Cooper*, 367 F.3d at 511.  The Court therefore has declined to place weight on the factor in reaching its determination.

22